# In the United States Court of Federal Claims

No. 18-1805C
Filed: December 6, 2022
FOR PUBLICATION

---

**DERRICK T. DANIELS,**

*Plaintiff,*

**v.**

**UNITED STATES,**

*Defendant.*

---

*Jason Ellis Perry*, Law Office of Jason Perry, LLC, Wellington, FL, for the plaintiff.

*Douglas Glenn Edelschick*, Civil Division, U.S. Department of Justice, Washington, DC, with *Maj. Alane Ballweg*, United States Army Legal Services Agency, Ft. Belvoir, VA, of counsel, for the defendant.

## MEMORANDUM OPINION

***HERTLING*, Judge**

After a distinguished military career, the plaintiff, Derrick T. Daniels, was involuntarily separated from the United States Army ("Army") in 2012 for adultery and domestic assault. In 2018, the plaintiff sued the United States, acting through the Army, for backpay and disability-retirement pay and allowances. He claims entitlement to this relief due to his allegedly improper separation from the Army.

Notwithstanding the plaintiff's excellent service record, the Army involuntarily separated the plaintiff and honorably discharged him after administratively determining that he had violated the Uniform Code of Military Justice ("UCMJ"). Specifically, the Army determined that, in 2008, the plaintiff had committed adultery and assaulted his then-wife when she confronted him about the adultery. These acts of misconduct were first noted in a General Officer Memorandum of Reprimand ("GOMOR") entered into the plaintiff's Official Military Personnel File ("OMPF") in 2009. The GOMOR also reprimanded the plaintiff for engaging in multiple affairs and impregnating the wife of a deployed soldier; the allegations against the plaintiff supporting these latter grounds for reprimand were later recanted.

The plaintiff alleges that the inclusion of the GOMOR and a related investigative report in his OMPF violated Army Regulation 600-37, which requires that documents included in a soldier's OMPF meet the Privacy Act's standards of accuracy, relevance, timeliness, and

completeness.  The plaintiff claims the inclusion of these documents in his OMPF was improper because they contained factually inaccurate statements.

Additionally, the plaintiff claims that, pursuant to Army regulations, he should have received a medical evaluation and been considered for separation from the Army on account of a disability because he failed to meet the standards for retention due to his mental health.

On the plaintiff's first claim, the defendant argues that the merits of a military reprimand are non-justiciable and that, in any case, the inclusion of disputed facts in the GOMOR was supported by substantial evidence or, alternatively, was harmless error.  Regarding the plaintiff's second claim, the defendant argues that the plaintiff met the Army's retention standards at the time of his separation and was therefore not entitled either to a disability evaluation prior to separation or to consideration for a separation based on a disability.

After several remands to the Army Board for Correction of Military Records ("ABCMR"), the parties have cross-moved for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC").  The motions have been fully briefed, and the parties presented oral argument on November 15, 2022.

Because the plaintiff cannot show prejudice from the inclusion of the allegedly erroneous information in the GOMOR or the related investigative report and did not meet the regulatory standards for referral for a disability evaluation, the plaintiff's motion for judgment on the administrative record is denied, and the defendant's cross-motion for judgment on the administrative record is granted.

## I.    BACKGROUND[1]

### A.    The GOMOR and Investigative Memo

The plaintiff served in the Army, both on active duty and in the Reserves, from 1990 to 2012, attaining the rank of Captain.  The plaintiff's military records demonstrate that he was an outstanding soldier, as reflected in repeated performance reviews that described him and his work as "outstanding," "exemplary," and "utterly superb."  (AR 950, 1697-98, 1700-09, 1712-29, 1840-41.)[2]  The plaintiff was deployed to Iraq three times: from February 2004 through February 2005, from August 2006 through November 2007, and from December 2009 through December 2010.  During his first two tours, the plaintiff was exposed to significant combat stressors: soldiers under his command were killed or injured by improvised explosive devices and snipers; the plaintiff witnessed a suicide car bomber kill an Iraqi police officer; and the

---

[1] This recitation constitutes findings of fact based on the administrative record.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1353-54 (Fed. Cir. 2005).

[2] Citations to the administrative record (ECF 37, *supplemented by* ECF 50) are cited as "AR" with the pagination reflected in that record as filed with the court.

plaintiff was involved in the retrieval from canals of bloated, possibly tortured, corpses.  (AR 55, 866.)

After returning from his second tour in Iraq, the plaintiff was stationed at Fort Sill, Oklahoma.  In the summer of 2008, the plaintiff voluntarily sought treatment for a drinking problem and for mental-health symptoms he had begun to suffer.  (AR 5, 21.)  During that summer, the plaintiff engaged in an extra-marital affair.  (AR 323.)  When the plaintiff's wife learned of the affair in November 2008, the plaintiff and his wife had a physical altercation.  The plaintiff later admitted to the Army that during the altercation he had pushed his wife "several times," "struck her on the side of the head once" with a "plastic baton," and "grabbed her around the neck, squeezing."  (AR 838.)  He also admitted to the Army to having the affair that prompted the altercation with his wife.  (*Id.*)  A few days after their physical altercation, the plaintiff's wife reported the assault by the plaintiff to the civilian police and subsequently obtained a no-contact order against the plaintiff.  (AR 1016-18.)

The plaintiff's battalion commander imposed a no-contact order in November 2008 barring the plaintiff from contact with his wife after the plaintiff had been interviewed by a local police detective at his battalion headquarters.  (AR 1017.)  Ultimately, the plaintiff's wife declined to pursue civilian assault charges.  (AR 1488.)  The Army, however, initiated its own investigation.

In December 2008, the Army investigating officer issued findings that the plaintiff had violated the UCMJ by committing adultery, assaulting his wife, and engaging in conduct unbecoming an officer.  (AR 1480-82.)  He recommended that the plaintiff: (1) receive a GOMOR; (2) "be immediately removed from any duties involving officer instruction and reassigned to a position of lesser influence"; and (3) continue to seek "professional help . . . including anger management and marriage counselling."  (AR 1482.)  The investigating officer also suggested lifting the Army's no-contact order because the civilian no-contact order had been lifted and the plaintiff's wife "no longer fe[lt] threatened by [the plaintiff]."  (*Id.*)

On January 7, 2009, the plaintiff's battalion commander took a sworn statement from the woman with whom the plaintiff later admitted to having an affair (hereafter, "Ms. Doe").  (AR 765-67.)  In the statement, Ms. Doe claimed that the plaintiff had told her that he had previously impregnated another woman named "Tanisha."  The investigating officer subsequently spoke to the plaintiff's wife, who indicated that, based on a conversation she had had with Ms. Doe, Tanisha was the wife of a deployed soldier, although the plaintiff's wife declined to include this information in her sworn statement.  (AR 1481.)  Ms. Doe also asserted that she herself was pregnant and had text messages in which the plaintiff acknowledged being the father.  (AR 766-67.)

On January 13, 2009, the plaintiff's battalion commander prepared a memorandum for the record (the "January Memo").  The battalion commander noted in the January Memo that, even though the plaintiff's wife had dropped the assault charge, "[t]he city of Lawton and Comanche County Courts are continuing [ ] to prosecute the case against [the plaintiff.]"  (AR 1468.)  The plaintiff's battalion commander, disregarding the Army investigator's recommendation, also noted in the January Memo that he was maintaining the no-contact order

he had put in place. (*Id.*)  The battalion commander also noted that the "County" no-contact order was still in effect. (*Id.*)[3]  The battalion commander recommended that the plaintiff receive a "GOMOR and be dismissed from the service. (*Id.*)

On January 29, 2009, the commanding general at Fort Sill issued the plaintiff a GOMOR pursuant to Army Regulation 600-37.  The GOMOR reprimanded the plaintiff "for domestic assault and battery for beating, choking, and threatening [his] wife, for ongoing multiple adulterous affairs with women including one married to a deployed Soldier, and for conduct unbecoming an officer and gentleman."  The GOMOR also set forth factual findings, including that the plaintiff had admitted to pursuing an extra-marital relationship with Ms. Doe beginning in June 2008 and to fathering twins with her.  The GOMOR also found that the plaintiff had admitted to having had several other extra-marital affairs, one of which also resulted in the pregnancy of a deployed soldier's wife.  Finally, the plaintiff was chastised in the GOMOR for his "repugnant" behavior and his failure to lead by example.  The GOMOR also noted the commanding general's intention to have the GOMOR included in the plaintiff's OMPF, rather than the plaintiff's local file.  The GOMOR would be withheld from the OMPF, however, until the commanding general could consider the plaintiff's rebuttal and any recommendations from the plaintiff's chain of command.  (AR 831-32.)

In February 2009, the plaintiff secured a noose to a beam, stood on a table with the noose around his neck, and prepared to jump in an apparent attempt at suicide, but he stopped the attempt after calling his parents and texting his wife.  (AR 1250-51.)  The plaintiff then sought treatment at a local hospital emergency room, where he agreed to go to the Red River Mental Clinic ("RRMC") for mental-health treatment.  (AR 1251.)  The plaintiff's hospital records noted that the plaintiff "had a chronic history of behavior and relationship problems over the last several months," and that he had seen several different mental-health professionals, one of whom had prescribed Zoloft.  (AR 1250.)  The hospital records further indicated that the plaintiff "denie[d having] a lot of PTSD-type symptoms such as nightmares and intrusive recollections and thoughts," although he "remember[ed] being somewhat depressed." (*Id.*)  The notes also described that the plaintiff's "impulse control and judgment ha[ve] been quite poor as the unit reports that [the plaintiff] said several extramarital relationships in the domestic assault with his wife as other issues as well that the behavioral problems and yet when he goes to work they say he is quite effective . . . ." (AR 1251) (Quote reproduced accurately).

RRMC staff provided the plaintiff with 10 days of in-patient care, including medication and individual- and group-therapy sessions.  The plaintiff's discharge notes reflect that the

---

[3] It is unclear from the record whether the civilian no-contact order was still in effect in January 2009.  The plaintiff's battalion commander noted that it was (AR 1468), but the Army investigating officer noted that it had been lifted as of December 15, 2008, after he was told by the plaintiff's wife that she had taken steps to lift it.  (AR 1481-82.)  A note contained in one of the plaintiff's medical records, dated December 23, 2008, supports the battalion commander's version, as it reports that the plaintiff "is separated from his wife, with military and state no contact orders."  (AR 526.)  Ultimately, the discrepancy does not affect this litigation.

treatment had gone well, that the plaintiff was "in stable condition with no suicidal or homicidal ideation," and, despite having been diagnosed with severe and recurrent major depressive disorder, noted that the plaintiff was "overall . . . doing well." (AR 176-77.)

In March 2009, the plaintiff submitted his GOMOR rebuttal to the commanding general at Fort Sill. In the rebuttal, he "accept[ed] full responsibility for [his] actions" and acknowledged having had an affair with Ms. Doe and assaulting his wife. (AR 706.) The plaintiff, however, denied that he had had affairs with multiple women. (AR 710.) The plaintiff claimed he had said "things about past affairs that were not true in an effort to ease out of the relationship" with Ms. Doe. (*Id.*) He also claimed that he had "only admitted to [the Army Criminal Investigation Division] about one affair, not several as depicted in the investigation." (*Id.*) The plaintiff also disputed certain details of the domestic assault, though he admitted to striking his wife with a police baton from a Halloween costume. (AR 706.) The plaintiff also described his personal history, his service with the Army, the stressors he had faced during his deployments, and his hopes for the future. (AR 706-11.)

Later that month, an officer who had temporarily assumed the duties of Fort Sill's commanding general, reviewed the GOMOR. Agreeing with the unanimous recommendations of the plaintiff's chain of command, he filed the GOMOR in the plaintiff's OMPF. (AR 833-36.)

After receiving the GOMOR, the plaintiff also received two officer evaluation reports ("OERs") that, while acknowledging the plaintiff's outstanding service, contained negative evaluations. The first OER covered the plaintiff's service from May 2008 through March 2009 and noted his failure to meet the Army values of honor and courage. (AR 1087-88.)[4] The second OER covered the period from April to September 2009 and noted the plaintiff's failure to meet height and weight standards, even as the OER expressed confidence that the plaintiff would soon meet those standards. This second OER included positive remarks about the plaintiff's character. (AR 1090-91.)

Despite the reprimand contained in the GOMOR and the negative evaluations in the two OERs, the plaintiff was deployed to Iraq for his third tour, which lasted from December 2009 through December 2010. (AR 950.)

## B.    Administrative Separation Proceedings

In May 2010, while the plaintiff was serving in Iraq, the Army Human Resources Command ("AHRC") began the administrative process to separate the plaintiff from the Army due to his misconduct and the two OERs with negative comments. The plaintiff was ordered to "Show Cause for retention on active duty . . . because of misconduct, moral or professional dereliction." (AR 855-59, 1072-73.)

---

[4] Although the plaintiff had been initially selected for promotion to Major by the Fiscal Year 2008 Major Promotion Selection Board, the rating "Do Not Promote" in this OER prompted the Army to remove the plaintiff from the list for promotion to Major. (AR 366-67.)

In September 2010, the plaintiff petitioned the Army's Suitability Evaluation Board to transfer the GOMOR to the restricted section of his OMPF, where it would not be considered by promotion boards.  (AR 1753-56.)  In his petition, the plaintiff indirectly admitted to the extra-marital affair and the assault on his wife by noting that he took "full responsibility for [his] actions and underst[oo]d the ramifications [he] put others through from [his] dastardly behavior."  (AR 1753.)  The plaintiff acknowledged that his actions "emotionally scarred and humiliated [his] wife," and that he regretted "the continuous horrible lies that destroyed [his] personal integrity."  (*Id*.)  After conceding that he "[did]n't blame [his] command for anything," and that he "would have done the same thing if [he] was in their shoes," the plaintiff explained the steps he had taken to improve himself.  (AR 1754.)  These steps included working on weekends "as an in[-]home health care provider for the physically and mentally challenged" to earn extra money and to avoid alcohol on weekends.  The plaintiff also indicated that he had volunteered for his third deployment to Iraq "to prove [himself] more."  (AR 1754-55.)

In February 2011, the Suitability Evaluation Board unanimously denied the plaintiff's petition to transfer the GOMOR to the restricted section of his OMPF.  (AR 1744-52.)  The Suitability Evaluation Board acknowledged the plaintiff's progress, including two favorable OERs covering the periods of April through September 2009 and October 2009 through September 2010, which reflected "some improvements in [the plaintiff's] personal conduct."  (AR 1750.)  The Suitability Evaluation Board determined, however, that there was "insufficient evidence to show the intent of the GOMOR had been served and it would not be in the best interests of the Army to transfer it at this time."  (AR 1751.)  The Suitability Evaluation Board also determined that "insufficient time ha[d] passed for [the plaintiff] to have demonstrated a solid performance over a sustained period of time."  (AR 1750.)

In June 2011, the plaintiff submitted a written statement to the AHRC for consideration in the administrative separation proceeding.  He again admitted to having had a single adulterous affair and a domestic altercation; he denied having had other affairs or having impregnated a deployed soldier's wife.  (AR 1105-12.)  In support of his submission, he attached a signed and notarized, though unsworn, letter dated April 4, 2011, from Ms. Doe.  (AR 898.)[5]  In the letter, Ms. Doe recanted her statement that she had been impregnated by the plaintiff and admitted that her statements about the plaintiff having had multiple affairs and impregnated the wife of a deployed soldier were untrue.  (*Id*.)

---

[5] There is evidence in the record to question Ms. Doe's truthfulness.  She had once been placed into pretrial diversion in Texas after having been charged with fraud through identity theft, (AR 1380-90); she successfully completed pretrial diversion and the charges were dismissed.  (AR 1387.)  Although this information had been made available to the board of inquiry, (*see* ECF 37-1, at 5, listing AR 1380-90 in the "Board of Inquiry Documents"), the board of inquiry declined to consider this information because the charges against Ms. Doe had not resulted in a conviction.  (AR 1293.)  There is no need to resolve issues surrounding the truthfulness of Ms. Doe.

In addition to his written statement, the plaintiff submitted to the AHRC letters from several Army officers recommending his retention.  (AR 1127-31.) The plaintiff also provided the AHRC with medical records that described his problems with alcohol abuse, adjustment disorder with depressed mood, and other mental-health issues.  (AR 1118-26.)  These records contain one reference to Post Traumatic Stress Disorder ("PTSD").  The reference to PTSD is found in a one-page record prepared in June 2011 by a licensed clinical psychologist, Dr. Maria Aviles-Salgado, who saw the plaintiff "for [a] consult to re-establish care."  Specifically, this record included "[c]hronic post-traumatic stress disorder" among the list of conditions found in a section titled "AutoCites."  (AR 1126.)[6]  The board of inquiry also admitted into evidence another portion of the plaintiff's medical records.  (AR 1357-78.)  This portion of the plaintiff's medical records included three references to PTSD.  The first two references were in notes from September 2009, prepared by a clinical psychologist, Dr. Cherie Rios, and from April 2011, prepared by a physician, Dr. Christine Carruthers.  Both notes include PTSD in an "AutoCites" section listing the plaintiff's conditions.  (AR 1358, 1360.) The third reference to PTSD was in a 2009 note prepared as part of an initial visit by a social worker, Robert Finkelstein.  Mr. Finkelstein's reference was included in the assessment and plan, or "A/P," section.  (AR 1363 (more fully reproduced at AR 562-65.))  Mr. Finkelstein's note also included a reference to PTSD in a list of problems in an "AutoCites" section.  (AR 562.)

None of these records reflected any actual diagnosis of PTSD or explained the basis for their reference to PTSD.[7]  The 2009 reference by Dr. Rios, the 2011 reference by Dr. Carruthers, and the 2011 reference by Dr. Aviles-Salgado simply mention PTSD but do not otherwise discuss it; there are no indications that any of these medical professionals made a diagnosis of

---

[6] The AutoCites section of the record "appears to record a comprehensive running list of all the conditions . . . encountered and/or addressed with Plaintiff."  *Chaisson v. Astrue*, CIV 10-0798 WJ/KBM, 2011 WL 13284739, at *6 n.10 (D.N.M. Aug. 18, 2011).  The list covering the plaintiff also includes non-medical problems that clearly were not current (such as "[m]ilitary deployment"); were clearly not assessed during that visit (such as "[b]urns"); or, at first blush, appear mutually exclusive (such as "alcohol abuse – in remission," "alcohol abuse – episodic," and "alcohol abuse").  (AR 1126.)

[7] There is one reference in the record to the plaintiff receiving treatment for PTSD in early 2009.  That reference is found in the plaintiff's battalion commander's March 2009 recommendation to the commanding general at Fort Sill that the GOMOR be filed in the plaintiff's OMPF.  (AR 835.)  The battalion commander noted that he believed the plaintiff had rehabilitative potential in part because of his being "treated for PTSD."  (*Id.*)  The basis for this reference by the plaintiff's battalion commander is not evident from the record.  According to a 2019 advisory opinion prepared by an Army clinical psychologist for the ABCMR, Major Melissa Boyd, during a remand in this case, the earliest references to the plaintiff being diagnosed with PTSD are from April 2, 2009.  (AR 131 (apparently referencing AR 250).)  Notably, the plaintiff has not relied on or even cited either his battalion commander's March 2009 reference to PTSD or the April 2009 treatment; indeed, he has not alleged or argued that he had received treatment for PTSD around March or April 2009.

PTSD, and no PTSD symptoms or treatments are noted or discussed. (AR 1126, 1358-62.) The 2009 note by Mr. Finkelstein focuses primarily on the plaintiff's marital and drinking problems but does not include any other reference to a diagnosis of PTSD outside of the "A/P" section. (AR 563.) Mr. Finkelstein's 2009 note does not report PTSD in its "Diagnosis History" section, and, although it does refer to the plaintiff having had depression when he returned from Iraq, it also notes that the plaintiff is "[c]urrently not depressed." (*Id.*) In his review of the plaintiff's systems and physical findings, Mr. Finkelstein does not report the plaintiff having any notable neurological or psychological symptoms, although he described the plaintiff as "[n]ot well-appearing," "[i]n acute distress," and anxious. (AR 564.) Mr. Finkelstein's subsequent list of the plaintiff's problems is limited to "1. marital conflict" and "2. binge drinking." (*Id.*)

In April 2012, a board of inquiry was convened by the commanding general of the Third Infantry Division to examine the plaintiff's conduct and determine whether to recommend the plaintiff's administrative separation from the Army. (AR 1267-1304, 1438.) The plaintiff testified to the board of inquiry. (AR 987-90, 1295-1300.) He again admitted that he had had an affair with Ms. Doe; he further admitted that he had assaulted his wife. (AR 987, 1295.) The plaintiff denied having had any extra-marital affairs other than the one he acknowledged with Ms. Doe. (*Id.*)

At the Army's request, an Army clinical psychologist, Dr. Ana Parodi, who served as "Chief of Medical Evaluation Board-Behavioral Health," reviewed the plaintiff's medical records and testified to the board of inquiry. (AR 386-89.) Dr. Parodi explained that the plaintiff was not properly diagnosed with PTSD due to insufficient documentation of expected symptoms. (*Id.*) She concluded that it was "not possible that [the plaintiff] attacked his wife that night because he had PTSD." (AR 387.) Dr. Parodi explained that the plaintiff's description of the assault of his wife did not align with how a person suffering from PTSD, "significant depression, or an anxiety disorder," or an associative episode or flashback would have described the assault. (*Id.*) Because the plaintiff did not describe such an episode or flashback, Dr. Parodi concluded that the assault was due to "more of a personality trait than an emotional condition at that moment." (*Id.*) Dr. Parodi also questioned whether the "social worker," presumably Mr. Finkelstein, was qualified to diagnose PTSD; she further observed that Mr. Finkelstein's notes were devoid of any basis for a potential PTSD diagnosis. (AR 388-89.) Finally, Dr. Parodi pointed out that neither Mr. Finkelstein nor the "physician" whose notes were in the plaintiff's record had "documented what the traumatic event was" that caused the plaintiff's alleged PTSD. (AR 388.)[8]

After the presentation of the testimony and evidence, the board of inquiry determined that the plaintiff committed adultery and assaulted his wife. (AR 991.) The board of inquiry recommended that the plaintiff be involuntarily separated from the Army and receive an

---

[8] Dr. Parodi referred to the "physician involved in the diagnosis and treatment . . . at Fort Sill." (AR 388.) She appears to be referencing records from 2009, (AR 1360), because the plaintiff's 2011 medical records are from Winn Army Community Hospital at Fort Stewart, Georgia, (AR 1358.)

honorable discharge.  (AR 972, 991.)  In June 2012, the convening authority approved the board of inquiry's recommendation.  (AR 153, 967.)

In October 2012, the Army Board of Review for Eliminations ("Board of Review") convened, as required by Army Regulation 600-8-24, ¶ 4-17(a), to review the board of inquiry's findings and recommendations.  (AR 960-64.)

The plaintiff submitted to the Board of Review notes from his psychiatrist, Dr. Tracey Marks, dated April and May 2012.  (AR 1244-48.)  In these notes, Dr. Marks opined that the plaintiff had a "[history of] major depression" that was "in remission."  (AR 1246.)  Dr. Marks also noted that the plaintiff had a history of alcohol abuse and may have had PTSD in the past.  (Id.)  Dr. Marks further noted that the plaintiff was not experiencing symptoms of either disorder as of the dates of the notes.  (Id.)  Further, Dr. Marks's diagnosis of the plaintiff, dated April 30, 2012, did not include PTSD; rather, Dr. Marks diagnosed the plaintiff with a "[h]istory of major depression in remission," a "[h]istory of alcohol abuse – not current," and "[p]ossible dysthymia."  (AR 1244.)[9]  Dr. Marks opined that "no treatment [was] needed" as of May 2012, and that the plaintiff should "[r]eturn as needed."  (AR 1247.)

In addition to Dr. Marks's notes, the plaintiff submitted a personal statement in which he requested that the GOMOR be revised and placed in the restricted portion of his OMPF.  (AR 1227-32.)  He also requested that the two OERs with negative comments be removed from his OMPF.  (AR 1231.)

The plaintiff's personal statement focused mostly on his mental health.  The plaintiff claimed that he only first "realize[d] [he] had a PTSD diagnosis" when he attended the Warrior's Restoration Clinic at Fort Stewart, Georgia, in 2011.  Only then did the plaintiff "decide[] to get a separate opinion outside of the Army's health care system" by contacting Dr. Marks for a "consultation."  (AR 1227.)  The plaintiff also claimed that "[d]ysthymia was the only diagnosis [he] knew about prior to leaving Fort Sill, OK."  (Id.)  He noted that he had been dealing with severe depression, which he asserted "can" cause men to "becom[e] irritable or violent."  (AR 1228.)  Without explanation, the plaintiff, citing Dr. Marks's notes, acknowledged that "[t]here [was] no evidence of Dysthymia or PTSD."  (AR 1227.)

The plaintiff argued in his submission to the Board of Review that "the [b]oard [of inquiry] determined that [he] did not have multiple affairs to include impregnating a deployed Soldier's wife, despite [Ms. Doe's] claim to the contrary."  (AR 1227.)  The plaintiff also sought to tie his actions to his mental health by asserting that "[t]he domestic violence that occurred . . . was a result of [Ms. Doe's] false accusation," and that his diagnosis of major depression by Dr.

---

[9] Dysthymia is also called "persistent depressive disorder."  It is a "continuous long-term (chronic) form of depression . . . [that] is not as severe as major depression."  *Persistent Depressive Disorder (Dysthymia)*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/symptoms-causes/syc-20350929 (last visited November 28, 2022).

Marks "completely explain[ed] [his] Affair, Domestic Violence, and Weight Gain." (AR 1227-28.)  The plaintiff wrote that he "fully underst[ood] the seriousness of the adultery and domestic violence," but he argued that the Army needed to consider his mental condition and credit his efforts to improve himself.  (AR 1228-31.)

Upon reviewing the plaintiff's submissions, the Board of Review determined that the plaintiff had "committed adultery," had engaged in "an incident of domestic violence in which he assaulted his wife," and had "commit[ted] acts of personal misconduct." (AR 963.)  The Board of Review concluded that the plaintiff's "actions can be considered conduct unbecoming a commissioned officer." (*Id.*)  The Board of Review agreed with the board of inquiry's recommendation that the plaintiff be separated from the Army "with an Honorable characterization of service." (AR 964.)

The recommendations of both the board of inquiry and Board of Review were forwarded to the Deputy Assistant Secretary of the Army for Review Boards, who concurred in the recommendations.  (AR 959.)  Accordingly, on November 16, 2012, the plaintiff was discharged, pursuant to Army Regulation 600-8-24, ¶ 4-2(b), for unacceptable conduct with an honorable characterization of service.  (AR 950.)

### C.     Post-Separation Proceedings

In April 2014, the plaintiff applied to the ABCMR for reinstatement, promotion to the rank of Major, and removal of the GOMOR, which the plaintiff claimed had improperly affected his administrative separation, from his OMPF. (AR 373-74, 921-22, 925.)  The plaintiff asserted that the GOMOR contained inaccuracies, specifically the findings that the plaintiff had impregnated both Ms. Doe and the wife of a deployed soldier.  The plaintiff claimed he had been suffering from severe depression and PTSD at the time of his offenses. (AR 925-28.)  He further claimed that "[t]he symptoms of the affair, physical altercation and weight gain were the results of Severe Depression," (AR 926), and that "[i]f [he had been] treated for Severe Depression in the beginning, these transgressions would never have happened." (AR 928.)  In support of these claims, the plaintiff attached several documents, including an outpatient note by a Department of Veterans Affairs ("VA") psychiatrist, Dr. Arthur Soule, from 2013 made as part of "follow up treatment of PTSD."  Dr. Soule's note, referencing the plaintiff's "recurrent intrusive recollections of war and occasional bad dreams of it," included a diagnosis of PTSD. (AR 379, 619.)  In this note, Dr. Soule explained that the plaintiff "does have some PTSD from his 3 combat tours in Iraq," although he found that the PTSD "do[es] not . . . m[ake] him unstable in any way and [is] more a matter of mild occasional discomfort." (AR 619.)  The plaintiff also submitted his VA record, reflecting that the plaintiff was awarded a 30-percent disability rating for "[a]nxiety disorder not otherwise specified and major depressive disorder." (AR 620.)

In April 2015, the ABCMR denied the plaintiff's application, noting that the plaintiff's "contentions and supporting documents have been carefully considered and appear to lack merit." (AR 365-72.)  The ABCMR first addressed the disputed statements that Ms. Doe had recanted.  The ABCMR found that the board of inquiry and the Board of Review had had access to the GOMOR, its accusations, and the statements of Ms. Doe, but had recommended the plaintiff's separation from the Army for other reasons.  (AR 370.)  Specifically, the ABCMR

held that "it cannot be determined with any degree of certainty which statement made by [Ms. Doe] is true." (*Id.*)  The ABCMR found, however, that "when the board[s] deliberated, they determined that the two elements of impregnating a wom[a]n who was not his wife and having an affair with a deployed Soldier's wife were not the basis for [the plaintiff's] elimination." (*Id.*) The ABCMR further noted that the plaintiff never denied having an affair, a fact itself sufficient to permit the Army to initiate administrative removal proceedings, and concluded that "the GOMOR was properly administered based on the available evidence at the time . . . ." (AR 371.)

As to the causes ascribed by the plaintiff for his inappropriate conduct, the ABCMR found that the plaintiff's "contention that his PTSD caused his misconduct has also been noted and appears to lack merit." (*Id.*)  Specifically, in the three years after his misconduct, the plaintiff had received "maximum ratings on his OERs as well as recommendation for promotion," and there was "no evidence to suggest that he did not understand the difference between right or wrong or that he could not adhere to the right." (*Id.*)

In July 2015, the plaintiff petitioned the ABCMR to reconsider its decision. (AR 208-09, 359-60.)  In response to the reconsideration petition, the ABCMR requested that an Army clinical psychologist determine "if the condition of PTSD was duly considered during the military separation process of [the plaintiff]." (AR 207.)

An Army clinical psychologist, Major Melissa Boyd, reviewed the plaintiff's military medical records and based her October 2016 opinion on those records; she did not examine the plaintiff.  Maj. Boyd noted the plaintiff's treatment for alcohol abuse, adjustment disorder with anxiety and depressed mood, PTSD, and depression, and the plaintiff's assignment by the VA of a 30-percent disability rating for unspecified anxiety disorder with "[m]ajor [d]epressive [d]isorder." (AR 206-07.)  In considering the plaintiff's diagnosis of PTSD by Dr. Soule, Maj. Boyd concluded that the plaintiff's condition reflected "scarcely unusual PTSD symptoms for someone exposed to combat," and "had not made [the plaintiff] unstable in any way and that they were more a matter of mild occasional discomfort." (AR 207 (paraphrasing AR 282).) Despite finding that the plaintiff's PTSD and depression had not been misdiagnosed, Maj. Boyd opined that there was no evidence that these conditions "reasonably related to the misconduct of domestic violence and engaging in adultery," nor did these conditions "explain or directly mitigate [the plaintiff's] actions leading to an early separation from the Army." (*Id.*)  Maj. Boyd therefore found that there was no medical evidence that the plaintiff "was considered psychologically unfit for duty," or that the plaintiff's "transgressions would never have happened if he was treated for severe depression in the beginning." (*Id.*)

In December 2016, based on Maj. Boyd's advisory opinion, the ABCMR again rejected the plaintiff's claim. (AR 187-205.)  After reviewing the GOMOR and the complete record of the plaintiff's separation, the ABCMR determined that, based on the psychologist's advisory opinion, "the available medical evidence does not show that the diagnosis of depression or PTSD was misdiagnosed or that either condition mitigated his misconduct as the nature of these conditions were not reasonably related to the misconduct of domestic violence or engaging in adultery." (AR 204-05.)  Further, the ABCMR found that the "available medical evidence does not indicate [the plaintiff] was not responsible for his decisions/actions, that he was considered psychologically unfit for duty, and do not support his contention that his misconduct and weight

gain would never have happened if he was treated for severe depression in the beginning."  (AR 205.)

In November 2018, the plaintiff, appearing *pro se*, filed his initial complaint in this case. (ECF 1.)  The defendant consented to a voluntary remand in February 2019 to allow the ABCMR to consider new evidence submitted by the plaintiff, specifically his records from the RRMC.  (ECF 8.)

The plaintiff requested that the ABCMR refer him to a medical evaluation board ("MEB") and a physical evaluation board ("PEB") for placement on either the temporary or permanent disability list with disability retirement.  Alternatively, he requested reinstatement to active duty, the removal from his OMPF of the GOMOR and the two OERs with negative comments, and retroactive consideration for promotion to major.  (AR 3, 110-13.)  The plaintiff submitted two new medical documents to the ABCMR.  The first was an April 2020 opinion from Dr. Marks, who opined that the plaintiff suffered from major depression beginning in 2007 and that the depression was "related to [the plaintiff's] misconduct from 2008."  (AR 98-101.)  The second document consisted of clinical notes from May, July, and October 2012, documenting traumatic events in the plaintiff's life.  (AR 59-67.)  The clinical notes also include records of a PCL-5 test, which is used to diagnose PTSD; on the test, the plaintiff scored "40, where 31 is minimal cutoff suggestive of PTSD."  (AR 62, 65-67.)[10]

During this review on remand, the ABCMR obtained new advisory opinions from two Army clinical psychologists, Maj. Boyd and Dr. Heather Corkins.  Maj. Boyd's opinion for this remand is dated April 2019.  In her 2019 opinion, after reviewing the additional information the plaintiff had submitted, Maj. Boyd made "[n]o change" to her 2016 opinion's conclusions.  (AR 130.)  Maj. Boyd again concluded that the plaintiff's "medical conditions of PTSD or severe depression were correctly diagnosed in-service and were duly considered at the time of separation.  [The plaintiff's] basis for separation was Unacceptable Conduct and was not due to a misdiagnosis of PTSD or severe depression."  (AR 132.)

Dr. Corkins provided her opinion in June 2020.  (AR 82-89.)  In her opinion, Dr. Corkins opined on the plaintiff's fitness for service, noting that "a diagnosis of [Major Depressive Disorder], in and of itself does not fail medical retention standards; the expectation is with treatment individuals are able to improve and are given this opportunity before determining they are permanently unfit."  (AR 78-79.)  After reviewing the plaintiff's records, Dr. Corkins opined that "at no point did the [plaintiff's] symptoms, presentation, or functioning reflect a Soldier who was psychiatrically unfit," and that instead he "consistently reported mild or no symptoms, provided a 2012 off-post consultation which was void of an active psychiatric diagnosis, and exhibited exemplary performance."  (AR 80.)  She therefore concluded that "while the [plaintiff]

---

[10] Neither party references the plaintiff's result on the PCL-5 test in their briefs, and the plaintiff does not cite or rely on the result.

received behavioral health services in-service, he continued to meet medical retention standards." (*Id.*)

In November 2020, the ABCMR issued an opinion deciding that the plaintiff did not meet the standards for medical disability-retirement benefits. (AR 3-42.)[11] The ABCMR concluded that the plaintiff "failed to demonstrate by a preponderance of evidence an error or injustice warranting the requested relief," and that the greater weight of the evidence reflects that the applicant met medical retention standards at the time of he was separated from the Army. Accordingly, the ABCMR determined that the plaintiff had been properly discharged from the Army for misconduct. (AR 41-42.)

Following the ABCMR's decision on remand, in April 2021, the plaintiff secured an attorney and filed his first amended complaint. (ECF 32, 34.) In May 2021, the defendant filed the administrative record. (ECF 37.) The plaintiff filed a second amended complaint in July 2021. (ECF 40.) The defendant consented to another voluntary remand in August 2021 to provide the plaintiff "one final opportunity with the benefit of counsel to make any further arguments that were not considered previously by the ABCMR," as well as to allow the ABCMR to consider the claims raised by the plaintiff in his second amended complaint. (ECF 43, at 2.)

On this second remand, the plaintiff argued that the acting commanding officer who had directed the inclusion of the GOMOR in the plaintiff's OMPF did not have the authority to issue that order. (AR 2701, 2703.) As a result of this alleged lack of legal authority, the GOMOR should not have been included in the plaintiff's OMPF and must therefore be removed from the OMPF. (*Id.*) Without the evidence from the GOMOR, the plaintiff asserted that his separation had to be voided. (*Id.*)

The plaintiff also argued to the ABCMR that the Army was required to "dual process" him through the disability evaluation system while he was being considered for involuntary

---

[11] Specifically, the ABCMR found that the plaintiff's service and medical records did not show: (1) that the plaintiff "was issued a permanent physical profile rating"; (2) that "he suffered from a medical condition, physical or mental, that affected his ability to perform the duties required by his MOS and/or grade or rendered him unfit for military service"; (3) that "he was diagnosed with a medical condition that warranted his entry into the Army Physical Disability Evaluation System"; (4) that "he was diagnosed with a condition that failed retention standards and/or was unfitting"; or (5) that his relevant OERs "indicate medical impairment prevented reasonable performance of the duties required of the [plaintiff's] office, grade, rank, or rating." (AR 18-19.)

separation once his chain of command learned that he had been hospitalized in 2009.  (AR 2701-03.)[12]

In February 2022, the ABCMR issued its decision on the claims raised by the plaintiff on this second remand.  (AR 2699-2733.)  The ABCMR determined that the acting commanding officer's authority was valid, and that the plaintiff had failed to demonstrate by a preponderance of evidence that his separation and the denial of disability benefits were incorrect or unjust.  (AR 2727.)  The ABCMR also determined that the record reflected that the plaintiff's medical condition had been evaluated and that he had met Army retention standards at the time of his separation; the plaintiff's conditions therefore did not warrant referral to the disability evaluation system.  (AR 2728.)  Based on these conclusions, the ABCMR denied the plaintiff's request for reconsideration.  (*Id.*)

In April 2022, the plaintiff filed his third amended complaint, which is the operative complaint.  In his third amended complaint, the plaintiff advances two claims.  (ECF 49.)  First, the plaintiff alleges that he was wrongfully separated from the Army and improperly denied consideration for promotion.  As a result, he alleges that he is owed active-duty pay and allowances pursuant to 37 U.S.C. § 204, the Military Pay Act.  In support of this claim, the plaintiff alleges that the Army violated several regulations by improperly considering the GOMOR, failing to consider whether the plaintiff's mental illness caused his misconduct, and neglecting to "dual track" his separation on medical disability grounds.  (*Id.* at ¶¶ 36-41.)[13]  Second, the plaintiff claims that he is owed disability-retirement pay pursuant to 10 U.S.C. § 1201 because the Army did not properly diagnose and treat the plaintiff's mental-health disorders.  He further claims that the Army violated Army Regulation 635-40, ¶ 4-4 by failing to refer him for disability-evaluation-system processing, which he alleges would have found him qualified for at least a 30-percent disability-retirement rating.  (*Id.* at ¶¶ 42-46.)

On July 20, 2022, the plaintiff filed a motion for judgment on the administrative record.  (ECF 53.)  On August 18, 2022, the defendant filed its cross-motion and response.  (ECF 54.)  On September 22, 2022, the plaintiff filed a response and reply to the defendant's filings, and on

---

[12] "Dual-processing" refers to the requirement under Army Regulation 635-40, ¶ 4-4(a) that an officer who is to be administratively removed from the Army also be simultaneously processed for a disability separation if the officer is "believed to be unfit because of physical disability."  *See also* Army Regulation 600-8-24, ¶ 4-3.  Discretion on whether to separate such an officer on disability or administrative grounds after dual-processing rests with the Secretary of the Army.  Army Regulation 600-8-24, ¶ 1-24(b).

[13] The plaintiff's first claim also challenges the authority of the officer who directed the GOMOR be filed in his OMPF, the accuracy of the findings regarding the plaintiff's weight and height in his OERs, and the improper consideration of the notes in the OERs related to the GOMOR; the plaintiff did not argue these issues in his briefs, and they are accordingly waived.

October 13, 2022, the defendant filed its reply brief.  (ECF 55, 57.)  Oral argument was held on November 15, 2022.

## II.    JURISDICTION

The Tucker Act limits the jurisdiction of the Court of Federal Claims to causes of action based on money-mandating statutes and regulations.  28 U.S.C. § 1491(a)(1).   Claims under the Military Pay Act, 37 U.S.C. § 204, fall within this Tucker Act jurisdiction.  *Metz v. United States*, 466 F.3d 991, 995-99 (Fed. Cir. 2006).  Claims for disability pay arise under 10 U.S.C. § 1201, which is also money-mandating.  *See Sawyer v. United States*, 930 F.2d 1577, 1580 (Fed. Cir. 1991) (concluding that 10 U.S.C. § 1201 provides jurisdiction under the Tucker Act).   Claims for promotions under the Military Pay Act are money-mandating only if a service member met the legal requirement for promotion—*i.e.*, had a "clear-cut legal entitlement"—but the service failed to recognize it.  *Smith v. Sec'y of Army*, 384 F.3d 1288, 1294 (Fed. Cir. 2004) (internal quotation and citation omitted).

Because the plaintiff's claims arise under the Military Pay Act and 10 U.S.C. § 1201, jurisdiction exists over the plaintiff's claims for back pay and disability-retirement pay and benefits.

## III.    STANDARD OF REVIEW

On a motion for judgment on the administrative record pursuant to RCFC 52.1, the Court's review is limited to the administrative record, and the Court makes findings of fact as if it were conducting a trial on a paper record.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1353-54 (Fed. Cir. 2005); *see also Young v. United States*, 497 F. App'x 53, 58-59 (Fed. Cir. 2012) (*per curiam*) (applying the *Bannum* standard of review to an RCFC 52.1 motion involving a decision of a military records-correction board), *cert. denied*, 569 U.S. 964 (2013).  The Court must determine whether a party has met its burden of proof based on the evidence contained within the administrative record.   *Bannum*, 404 F.3d at 1355.  Genuine issues of material fact will not foreclose judgment on the administrative record.  *Id.* at 1356-57.

The Court of Federal Claims reviews decisions of military records-correction boards under the review standard of the Administrative Procedure Act ("APA").   *Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009); *see* 5 U.S.C. § 706 (establishing the scope of review under the APA).   Under the APA's standard of review, the court must uphold a military records-correction board's decision "unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence."   *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010).

## IV.    DISCUSSION

Two issues are in dispute: (1) whether the inclusion of the GOMOR and the January Memo in the plaintiff's OMPF conformed with Army Regulation 600-37, and (2) whether the Army properly declined to consider the plaintiff for a disability separation.

A.        Army Regulation 600-37

The plaintiff argues that the GOMOR and the January Memo do not meet the standards of the Privacy Act, as required by Army Regulation 600-37, ¶ 3-2(b).  (ECF 53, at 7-8.)  That regulation requires that "[u]nfavorable information filed in official personnel files must meet Privacy Act standards of accuracy, relevance, timeliness, and completeness."  Army Regulation 600-37, *Unfavorable Information* ¶ 3-2(b) (Dep't of Army Dec. 19, 1986).  Those Privacy Act standards are reflected in 5 U.S.C. § 552a(e)(5), which obliges agencies to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination."

Specifically, the plaintiff argues that the GOMOR includes the factually inaccurate claims that the plaintiff had committed adultery with multiple women and that he had impregnated the wife of a deployed soldier.  The plaintiff claims that the January Memo contains the erroneous assertion that the civilian authorities were continuing to prosecute the plaintiff for domestic assault in January 2009.  The plaintiff asserts that these factual claims included in the January Memo and the GOMOR were "patently false" and based on unverified hearsay or recanted testimony.  As a result, the plaintiff argues that the inclusion of these inaccurate factual claims in these documents in his OMPF violated the requirements of the Privacy Act and, therefore, Army Regulation 600-37.  (ECF 53, at 7-8; ECF 55, at 2-3.)

In response, the defendant argues that this claim presents a non-justiciable challenge to the merits of the GOMOR and the January Memo.  The defendant also contends that the documents were supported by substantial evidence at the time of their creation.  Further, the defendant argues that even if there was a Privacy Act violation, the ABCMR reasonably determined that the disputed facts were not the basis of the plaintiff's elimination from the Army.  (ECF 57, at 5-6.)  Accordingly, the ABCMR reasonably concluded that the plaintiff was not prejudiced by the inclusion of the inaccurate information in his OMPF because the basis for the plaintiff's separation was not that information but was instead the "undisputed incidents of domestic violence and adultery, which constituted misconduct and conduct unbecoming an officer."  (ECF 54, at 34-35.)

The plaintiff argues in reply that he has presented a procedural question involving the determination of whether the Army followed the standards set forth in Army Regulation 600-37, ¶ 3-2(b) by including "patently false allegations that had no evidentiary basis."  (ECF 55 at 2-3.)  Because the plaintiff seeks a determination of whether the Army's "procedures were followed by applying the facts to the statutory or regulatory standard," and the plaintiff does not question a decision in which "discretion [is] reserved for the military," *Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993), the plaintiff argues the claim is justiciable.

The plaintiff's claim appears to raise a question of first impression concerning the extent to which Army Regulation 600-37 incorporates the Privacy Act's protections and whether such a claim falls within the jurisdiction of the Court of Federal Claims.  No court appears to have addressed whether Army Regulation 600-37, ¶ 3-2(b) is limited to the *standards* set forth in the Privacy Act, or whether it includes an individual's *substantive* right to have a record corrected

16

under the Privacy Act. *See* 5 U.S.C. §§ 552a(d), 552a(e)(5), 552a(g). Thus, the question of whether the Privacy Act rights incorporated under Army Regulation 600-37, ¶ 3-2(b) only allow a challenge to the fairness of the process used to develop the record, or whether they are substantive and can be used to challenge the factual findings in the GOMOR, which otherwise would be a nonjusticiable challenge to the merits of a decision committed wholly to the discretion of the Army, is a question of first impression. *See Antonellis v. United States*, 723 F.3d 1328, 1332 (Fed. Cir. 2013) ("[A]lthough the *merits* of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular *procedure* followed in rendering a military decision may present a justiciable controversy.") (Emphasis in original) (internal citation and quotation omitted); *see also Edison v. Dep't of the Army,* 672 F.2d 840, 843 (11th Cir. 1982) ("The use of 'reasonableness' language [in 5 U.S.C. § 552a(e)(5)] requires the balancing of competing interests: army resources and the ability to assure accurate and complete records versus the likelihood that inaccurate and incomplete records will cause injury to the individual.").

Although a court must typically resolve whether a claim is justiciable before proceeding to address the claim, there is no need here to resolve these complex questions of first impression. Even assuming the plaintiff's arguments are justiciable and that the statements included in the GOMOR and the January Memo were either incorrect or not supported by substantial evidence, the plaintiff must demonstrate that "'the defect substantially affected the decision to separate him,'" or must at least "'set forth enough material to impel the court to direct a further inquiry into the nexus between the error or injustice and the adverse action.'" *Christian v. United States*, 337 F.3d 1338, 1343 (Fed. Cir. 2003) (quoting *Hary v. United States*, 618 F.2d 704, 707 (Ct. Cl.1980)); *Rogers v. United States*, 124 Fed. Cl. 757, 768 (2016); *see also Driscoll v. United States*, 158 Fed. Cl. 399, 412 (2022).

Under the standard set out by the Federal Circuit in *Christian*, the plaintiff cannot demonstrate that the factually erroneous information may have substantially affected the Army's decision to separate him.

With respect to the GOMOR, the ABCMR specifically found in its 2015 decision that the board of inquiry and the Board of Review had both "determined that the two elements of impregnating a wom[a]n who was not his wife and having an affair with a deployed Soldier's wife were not the basis for [the plaintiff's] elimination." (AR 370.) The ABCMR further noted that the board of inquiry and the Board of Review had found that a preponderance of the evidence showed that the plaintiff had committed adultery, domestic assault against his wife, acts of personal misconduct, and conduct unbecoming a commissioned officer. (AR 371.)

In its most recent decision in 2022, the ABCMR reiterated its conclusion that the "Army administrative boards separated [the plaintiff] based on evidence of the underlying misconduct including adultery and assaulting his wife." (AR 2728.) Although all the Army boards' decisions, except the board of inquiry's, noted the accusation in the GOMOR that the plaintiff had impregnated, or at least had had an affair with, the wife of a deployed soldier, (AR 5,10, 28 (2020 ABCMR), 147-48 (2016 ABCMR), 366 (2015 ABCMR), 659 (2011 Suitability Evaluation Board), 720 (2012 Board of Review); 2706 (2022 ABCMR)), no Army board made any finding that the plaintiff had committed those offenses, (AR 41-42, 157-58, 370-71, 661-62, 722-23, 991,

2727-28).  The two findings closest to such a finding are in the conclusions of the decisions of the ABCMR in 2020 and 2016. In 2020, the ABCMR "found no error in the *issuance of the GOMOR* and referred OERS – issued for domestic assault, adultery / multiple ongoing adulterous affairs, and failure to meet height and weight standards."  (AR 42) (Emphasis added). In 2016, the ABCMR discussion noted that the "GOMOR was issued as an administrative measure after" the investigating officer found that the plaintiff "did, by his own admission, have sexual relationships with other women while married."  (AR 158.)  Neither ABCMR decision, nor a decision of any prior Army board, suggests that the reason the plaintiff was separated from the Army was due to the disputed factual findings in the GOMOR.  (AR 41-42, 157-58.)

The plaintiff's only contrary argument is that "the word adultery can be both singular and plural.  No board specified with whom Mr. Daniels committed adultery or when.  It is unclear from the record what the boards actually found- one act of adultery, or multiple acts with different partners."  (ECF 55, at 5.)  In effect, the plaintiff's entire argument is premised only on the ambiguity of the identical singular or plural usage of the word "adultery."

The ABCMR in 2015, however, expressly rejected this argument by the plaintiff as related to the statements made by Ms. Doe.  On this point, the ABCMR found that "all of the boards that considered [the plaintiff's] case . . . determined that the two elements of impregnating a wom[a]n who was not his wife and having an affair with a deployed Soldier's wife were not the basis for his elimination."  (AR 336.)

Further, in 2016, the ABCMR noted that the plaintiff was arguing that the "[board of inquiry] accepted the merit of [Ms. Doe's recantation] affidavit," suggesting that the plaintiff understood that the board of inquiry did not decide to eliminate him based on the accusations that the plaintiff had impregnated a deployed soldier's wife or had multiple affairs. (AR 190; *see also* AR 27 (the ABCMR noting that the plaintiff argued that the "Board of Inquiry acknowledged [Ms. Doe's] affidavit recanting her story in 2012").)

The decision of the ABCMR must be sustained so long as it is reasonable and supported by substantial evidence.  The record here reflects that neither the board of inquiry nor the Board of Review made any specific findings regarding the allegedly erroneous information in the GOMOR or relied on that information in reaching their conclusions.  Instead, they relied on the misconduct to which the plaintiff himself admitted—that he had had an affair and assaulted his wife.  No other misconduct was necessary to support the recommendation of either the board of inquiry or Board of Review.  As a result, neither board needed to make any findings or draw any conclusions from the disputed accusations contained in the GOMOR.  The plaintiff himself acknowledged the behavior that supported the conclusions of both boards.  (AR 190; *see also* AR 27 (the plaintiff arguing that the "Board of Inquiry acknowledged [Ms. Doe's] affidavit recanting her story in 2012."), 1227 (the plaintiff writing in a memo to the Board of Review that "[t]he [board of inquiry] determined that I did not have multiple affairs to include impregnating a deployed Soldier's wife, despite Ms. [Doe's] claim to the contrary).)  True, the ABCMR's decision finding that neither the board of inquiry nor the Board of Review relied on the allegedly erroneous information depends on a negative inference (neither board referred to the information, hence neither board relied on it), but the absence of contrary evidence is enough to

support the ABCMR's decision under the governing standard of review.  The plaintiff must show the absence of substantial evidence supporting the ABCMR determination, and he cannot do so.

In addition, the record reflects that both the board of inquiry and the Board of Review had been fully aware that the plaintiff disputed some of the factual conclusions of the GOMOR and the January Memo.  The board of inquiry had the recantation document, allowing for the reasonable inference that because the board did not refer to the disputed facts in its conclusions, it did not rely on the disputed facts contained in the GOMOR.  (AR 336, 1113, 1143, 1238, 1270, 1281.)  The ABCMR in 2015 noted the dispute before both the board of inquiry and the Board of Review over some of the factual claims and concluded that "it cannot be determined with any degree of certainty which statement made by [Ms. Doe] is true."  (AR 336.)

The ABCMR in 2015 reasonably concluded that the board of inquiry and the Board of Review did not base their decisions on the disputed accusations, and that conclusion is reasonable and supported by substantial evidence.  Accordingly, the plaintiff has failed to show sufficient evidence to support his claim that any violation of Army Regulation 600-37, ¶ 3-2(b), as related to the GOMOR, affected the decision to separate the plaintiff from the Army.

As for the allegedly erroneous information in the January Memo, the plaintiff's third amended complaint makes no mention of the issue.  "[U]nder any pleading standard, a complaint must put a defendant 'on notice as to what he must defend.'"  *Artrip v. Ball Corp.*, 735 F. App'x 708, 715 (Fed. Cir. 2018) (quoting *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)).  The plaintiff's operative complaint as drafted did not adequately notify the defendant of the plaintiff's additional arguments raised during the briefing or oral argument at this stage of the proceeding.  Accordingly, the plaintiff has waived the issue.

Allowing the plaintiff to amend his complaint would avail him nothing.  Even if the issue regarding the content of the January Memo were not waived, the same lack of evidence showing a connection between the challenged information and the plaintiff's separation that doomed the plaintiff's challenge to the contents of the GOMOR holds true for the information in the January Memo.

Unlike the information in the GOMOR, the information contained in the January Memo is not particularly noteworthy, as it simply noted disputed facts, namely that the plaintiff had an upcoming court date and faced unspecified state charges for something other than assault.  (AR 667.)  These facts are not particularly significant next to the plaintiff's admitted acts of misconduct, including adultery and assaulting his wife.  (AR 346.)  The plaintiff has not cited to any part of the record in which any Army personnel, any of the boards that reviewed the matter, or any witness cited or relied on the January Memo (much less the specific information in the January Memo alleged to be incorrect) in any way material to the decision to separate the plaintiff.  Instead, the record reflects that only one board, the ABCMR in 2016, referenced these alleged facts and then only to summarize the contents of the January Memo.  (AR 194.)  Indeed, the January Memo's disputed findings are not related to any findings by any board, and nothing in any conclusion or recommendation by any board throughout the administrative proceedings against the plaintiff reference the claim in the January Memo regarding the pendency of state charges or court proceedings.  (AR 41-42, 157-58, 370-71, 661-62, 722-23, 959, 963, 991, 2727-

19

28.)  The plaintiff, therefore, cannot show that the January Memo's disputed findings had any effect on the Army's decision to separate him.

Because the plaintiff is unable to demonstrate that the alleged defect in either the GOMOR or the January Memo "'substantially affected the decision to separate him,'" *Christian*, 337 F.3d at 1343 (quoting *Hary*, 618 F.2d at 707), the plaintiff is unable to prevail on his claim under Army Regulation 600-37.

### B.    Dual-Processing and Retention Standards

The plaintiff argues that he should have been considered unfit for service under Army Regulation 40-501, ¶¶ 3-32 and 3-33, and therefore should have been dual-processed under Army Regulations 600-8-24, ¶ 4-3, and 635-40, ¶ 4-4.  (ECF 53, at 9-10; ECF 55, at 9-10.) Specifically, he claims that his mental health  in 2009 would have failed Army retention standards under Army Regulation 40-501, ¶¶ 3-32 and 3-33.  The plaintiff argues that his 10-day hospitalization in RRMC "prevented the performance of his military duties at that time."  (ECF 53, at 9-10.)  The plaintiff argues that the ABCMR's decision was arbitrary and capricious because it focused on the plaintiff's fitness to serve at the time of his separation in 2012, rather than when the plaintiff attempted suicide in February 2009.  (*Id.* at 10.)

In response, the defendant argues that the ABCMR weighed the record evidence and determined that the plaintiff met the Army's retention standards, and that the plaintiff merely presupposes without supporting evidence in the record that he did not meet retention standards. (ECF 54, at 37-43.)  Further, the defendant argues that the plaintiff's suicide attempt, 10-day hospitalization, and diagnosis of major depressive disorder do not undercut the ABCMR's determination that the plaintiff did meet Army retention standards given that he resumed "'socializing, engaging in enjoyed activities, and actively participating in his legal defense,'" with "'minimal symptoms or impairment'" upon his release from RRMC.  (*Id.* at 24 (quoting AR 79 (Dr. Corkins' 2020 advisory medical opinion); and 40 (citing AR 470-71 (medical record of Feb. 27, 2009, phone call between the plaintiff and his clinical psychologist))).)  Additionally, the defendant asserts that the plaintiff's performance reviews following February 2009 demonstrate that the plaintiff's alleged mental-health conditions did not affect the performance of his duties.  The defendant underscores that two Army clinical psychologists, Maj. Boyd and Dr. Corkins, reviewed the plaintiff's medical records and concluded that the plaintiff was fit for duty.  (*Id.* at 41) (citing AR 80, 207.)  The defendant argues that the plaintiff's excellent performance reviews in "the years that followed after February 2009" also demonstrate that the plaintiff was fit for duty.  (ECF 54, at 40-42 (citing AR 1887-88, 1890-91, 1906-09).)

The defendant also contends that the plaintiff's alleged symptoms were not "persistent or recurring," as required by Army Regulation 40-501, ¶¶ 3-32 and 3-33.  (*Id.* at 42.)  The defendant argues that the ABCMR reviewed and considered the relevant retention standard and

based its decision on the evidence in the record.  (*Id.* at 41-42) (citing AR 44, 2710-11, 2713-14, 2728.)[14]

The plaintiff does not meaningfully rebut the defendant's interpretation of the relevant regulations.  Instead, the plaintiff argues that neither the ABCMR nor the medical experts on whose opinions the ABCMR relied in rejecting the plaintiff's claim provided any analysis or explanation as to why the plaintiff's 10-day hospitalization at RRMC did not qualify as an "extended hospitalization" sufficient to satisfy Army Regulation 40-501.  (ECF 55, at 9-11.)

Army Regulation 40-501, Chapter 3 "gives the various medical conditions and physical defects which may render a Soldier unfit for further military service."  Army Regulation 40-501, *Medical Services: Standards of Medical Fitness* ¶ 3-1 (Dep't of Army Aug. 4, 2011).[15] "[P]ossession of one or more of the conditions listed in this chapter does not mean automatic retirement or separation from the Service." *Id.* at ¶ 3-4.  Instead, "[p]hysicians are responsible for referring Soldiers with conditions listed below to an MEB," which must evaluate "all of the Soldier's medical problems and physical limitations," and a "PEB will make the determination of fitness or unfitness." *Id.*

"Mood disorders," such as depression, and "[a]nxiety, somatoform, or dissociative disorders," such as PTSD, are specifically listed as potential causes for medical separation under Army Regulation 40-501; ¶ 3-32 of the regulation applies to mood disorders and ¶ 3-33 applies to the latter types of disorders.  "The causes for referral to an MEB" for disorders covered by either ¶ 3-32 or ¶ 3-33 are identical:

> (a)  Persistence or recurrence of symptoms sufficient to require *extended* or recurrent *hospitalization*; or

---

[14] The defendant argues that, even if the plaintiff had been dual-processed, the decision whether to give him a medical or administrative separation is one committed wholly to the discretion of the Secretary of the Army, and that the decision is therefore non-justiciable.  (ECF 54, at 37-38.)  While the ultimate decision to separate an officer administratively or medically may be discretionary, the Army's regulations governing when dual-processing should be applied establish a non-discretionary process that a court may enforce.  *See* Army Regulation 600-8-24, ¶ 4-3 and Army Regulation 635-40, ¶ 4-4(a).  The defendant's argument that this claim is non-justiciable is rejected.

[15] The parties appear to disagree about whether the 2007 or 2011 version of Army Regulation 40-501 applies, although neither party directly addresses this issue.  The regulation in place at the time of the officer's retirement is the version usually applicable.  *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005).  Because the language of the relevant provisions of Army Regulation 40-501 appears to be the same in both versions, it is unnecessary to decide which version of the regulation applies.  Citations are to the 2011 version.

> (b) Persistence or recurrence of symptoms necessitating limitations of duty or duty in protected environment; or
>
> (c) Persistence or recurrence of symptoms resulting in interference with effective military performance.

*Id.*, ¶ 3-32 (Emphasis added).[16] Neither ¶ 3-32 nor ¶ 3-33 of the regulation defines what constitutes an "extended . . . hospitalization."

Army Regulation 635-40 also refers to the dual-processing requirement:

> 4–4. Commissioned or warrant officers who may be separated under other than honorable conditions.
>
> a. A commissioned or warrant officer will not be referred for disability processing instead of elimination action (administrative separation) that could result in separation under other than honorable conditions. Officers in this category who are believed to be unfit because of physical disability will be processed simultaneously for administrative separation and physical disability evaluation.

Army Regulation 635-40, *Personnel Separations: Physical Evaluation for Retention, Retirement, or Separation*, ¶ 4-4(a) (Dep't of Army March 20, 2012). Implicit in the limited application of this requirement for dual-processing is some pre-existing basis to believe the officer is unfit for retention. *Id.*

Also relevant to the analysis is Army Regulation 600-8-24, ¶ 4-3(a), which establishes the standard for officer transfers and discharges, including when the requirement for dual-processing applies. This regulation provides:

> a. An officer referred or recommended for elimination under this chapter who does not meet medical retention standards will be processed through both the provisions of this regulation and through the MEB/PEB process as described in paragraph 1-22.

Army Regulation 600-8-24, *Officer Transfers and Discharges*, ¶ 4-3 (Dep't of Army Sept. 13, 2011). Importantly, the regulation specifically requires that a soldier "not meet medical retention

---

[16] Given that the record reflects that the plaintiff had diagnoses for both depression and PTSD, both ¶¶ 3-32 and 3-33 could apply to the plaintiff's conditions. The requirements "for referral to an MEB" under ¶ 3-33 are identical to those under ¶ 3-32, and they are therefore referenced together.

standards" before being referred to the "MEB/PEB process," that is, for dual-processing. *Id.* Thus, this regulation also implies a pre-existing basis to believe an officer is unfit for retention.

Here, the plaintiff asserts that his suicide attempt and subsequent 10-day hospitalization at RRMC rendered him unfit in 2009 under Army Regulation 40-501, ¶¶ 3-32 and 3-33, and that he therefore was entitled to dual-processing under Army Regulation 600-8-24 and Army Regulation 635-40.

In pursuing his argument, the plaintiff does not provide any analysis of the text of Army Regulation 40-501, such as by providing arguments as to how to define its key terms, including "persistence or recurrence of symptoms," "extended or recurrent hospitalization," "limitations of duty or duty in protected environment," or "interference with effective military performance." The plaintiff also does not cite any legal authorities to support his argument under this regulation. It is not up to a court to devise and develop arguments for a party; it is the party's responsibility to present arguments in a cogent manner in support of a claim. The plaintiff has failed to do so here. The plaintiff has therefore waived his argument analyzing Army Regulation 40-501. *See Seventh Dimension, LLC v. United States*, 161 Fed. Cl. 110, 129 (2022) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("'[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'")).

Even if the argument was not waived by the plaintiff's failure to present a reasoned argument regarding the regulations, however, the plaintiff is unable to demonstrate that he is entitled to reversal "by cogent and clearly convincing evidence." *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986) (internal quotation omitted). A military corrections board "is not required to explain the reasons for its decision 'in great detail,' but must provide an applicant with 'sufficient notification . . . to permit him, if he may, to rebut [its] action.'" *Peoples v. United States*, 87 Fed. Cl. 553, 576 (2009) (quoting *Craft v. United States*, 544 F.2d 468, 474 (Ct. Cl. 1976)). Although the ABCMR and the medical advisory opinions on which it relied do not engage in a thorough analysis of the relevant regulations, they do specifically cite them in rejecting the plaintiff's claims. (AR 42, 46, 74, 82, 206, 2710-11, 2713-14, 2729, 2731-32.) By citing the appropriate regulations and rejecting the plaintiff's claims under them, the ABCMR has satisfied its responsibility.

The plaintiff has yet another hurdle he is unable to overcome, were the merits of his claim to be considered: the Federal Circuit has rejected his argument that his 10-day stay at RRMC constituted an "extended . . . hospitalization" for purposes of the Army's regulations. In *Chambers v. United States*, a soldier who had been honorably discharged requested that the ABCMR grant him military-retirement pay based on a diagnosis of PTSD. 417 F.3d 1218 (Fed. Cir. 2005). Among other claims, the plaintiff argued that his PTSD required referral to an MEB under the 1970 version of Army Regulation 40-501. The plaintiff in *Chambers* had been hospitalized three times, including once for 11 days, following a diagnosis of "personality pattern disturbance, transient, situational." *Id.* at 1221. The plaintiff was later diagnosed with PTSD. The Federal Circuit concluded that each of the plaintiff's three medical incidents, including the hospital stay of 11 days, "was of short duration and had no effect on the scope or performance of his military duties." *Id.* at 1227. The Federal Circuit then determined that the

plaintiff failed to satisfy "the criteria for referral to a Medical Examination Board set out in AR 40–501." *Id.*  Notably, the language of the applicable 1970s version of Army Regulation 40-501 also required "'persistence or recurrence . . . sufficient to require extended or recurrent hospitalization.'" *Id.* (quoting the version of Army Regulation 40-501 in effect in 1970).

The plaintiff's case is not materially different from *Chambers*.  The plaintiff was hospitalized at RRMC for 10 days; the longest hospitalization of the plaintiff in *Chambers* was 11 days.  Both plaintiffs were hospitalized in connection with symptoms possibly associated with PTSD.  During their hospitalizations, both plaintiffs were briefly unable to perform their duties, and both plaintiffs were prescribed medication to help address their symptoms.  *Id.* at 1221; (AR 1250.)  Following their release from hospital, both plaintiffs quickly returned to their regular duties.  *Chambers*, 417 F.3d, at 1227; (AR 1700-03 (reviewing the plaintiff's performance from April through September 2009 without noting any absence from duty); *see also* AR 471, 473 (medical records indicating the plaintiff spoke with his defense counsel and engaged in leisure activities by the end of February with no indication that the plaintiff was not working).)

Accordingly, in the absence of any contrary analysis or authority from the plaintiff, *Chambers* compels rejection of the plaintiff's claim as a matter of law.  If an 11-day hospitalization is not "extended," then *a fortiori* a 10-day hospitalization is not "extended." Accordingly, the plaintiff is unable to show that he was hospitalized for an "extended" time, as was required to trigger referral to a MEB under either Army Regulation 40-501, ¶¶ 3-32(a) or 3-33(a).  Given the plaintiff's statement at oral argument that his 2009 hospitalization was the "lynchpin" of his dual-processing argument, and in the absence of any argument that the other provisions of Army Regulation 40-501 were met, the plaintiff's argument must fail.[17]

### C.   Army Regulation 600-8-24, ¶ 4-3(b)

Finally, the plaintiff argues that Army Regulation 600-8-24, ¶ 4-3, required the Army to conduct a mental-health evaluation, which is "a different exam than for disability processing," before separating the plaintiff.  (ECF 53, at 8; ECF 55, at 8-9.)  To support this claim, the plaintiff relies on Army Regulation 40-501, ¶ 8-12(c)(1)(a), which requires that "a Soldier who is involuntarily separated from [Active Duty]" receive a separation health assessment.  (ECF 55, at 8-9.)  The plaintiff argues he should have been provided a mental-health evaluation that would have considered "'whether the incapacitating mental illness could have been the cause of the conduct under investigation.'"  (ECF 53, at 8 (quoting Army Regulation 600-8-24, ¶ 4-3(b)).)

Army Regulation 600-8-24, ¶ 4-3(a)-(b) provides:

---

[17] Audio tape: Recording of Oral Argument on Motions for Judgment on the Administrative Record in *Daniels v. United States*, No. 18-1805, at 1:07:27-1:09:28 (Nov. 15, 2022) (The Court: "Is the failure by the Army to address that point, is that the lynchpin of your claim here?" Plaintiff's Counsel: "It is, your honor.") (on file with the Court).

a. An officer referred or recommended for elimination under this chapter who does not meet medical retention standards will be processed through both the provisions of this regulation and through the MEB/PEB process as described in paragraph 1-22.

b. When it is determined the officer's mental condition contributed to military inefficiency or unsuitability, the medical evaluation will include a psychiatric study of the officer. This study will indicate whether the officer was able to distinguish right from wrong and whether the officer currently has the mental capacity to understand board and judicial proceedings and participate in defense. When applicable, the report will also indicate whether the incapacitating mental illness could have been the cause of the conduct under investigation.

Application of the plain meaning of this regulation requires the rejection of the plaintiff's claim. Subparagraph 4-3(a) applies only to an officer "who does not meet medical retention standards." The entire paragraph can therefore apply only when an officer does not meet the medical-retention standards. Thus, the structure of the text implies the need for a pre-existing determination regarding the officer's ability to meet the retention standards to trigger the MEB/PEB process. Subparagraph 4-3(b) refers explicitly to such a pre-existing determination: "[w]hen it is *determined* the officer's mental condition contributed to military inefficiency or unsuitability, the medical evaluation will include a psychiatric study of the officer." (Emphasis added.) That determination, in context, must be the determination that the officer fails to meet the retention standards, because although ¶ 4-3(b) does not on its own define the referenced determination, the language must be read *in pari materia* with ¶ 4-3(a). Subparagraph 4-3(b) therefore must refer to a pre-existing determination that the officer has failed to meet medical-retention standards and set forth additional requirements for what the medical evaluation in the MEB/PEB process must cover when ¶ 4-3(a) applies. Subparagraph 4-3(b) is read most naturally in this way and does not require some separate medical evaluation. Because the plaintiff was already determined to have met medical-retention standards, ¶ 4-3(b) would not create an independent requirement for the Army to have conducted a mental-health evaluation of the plaintiff.

The plaintiff's separate argument that Army Regulation 40-501, ¶ 8-12(c)(1)(a) required a "Separation Health Assessment" is waived because the plaintiff raised it only in his reply brief. (ECF 55, at 8-9.)

## V.   CONCLUSION

The plaintiff's challenges to the inclusion of the GOMOR and the January Memo in his OMPF fail because, even assuming the issue is justiciable and the inclusion was in error, the plaintiff has not overcome the ABCMR's finding that those errors in the GOMOR were immaterial or can show that any errors in these two documents influenced the decision to separate him from the Army. The plaintiff has also not demonstrated either that he failed retention standards such that the Army was required to process the plaintiff for a medical-

25

disability separation, or that some other regulation triggered the requirement pursuant to Army Regulation 600-8-24, ¶ 4-3(b).

Accordingly, the plaintiff's motion for judgment on the administrative record (ECF 53) is denied, and the defendant's cross-motion for judgment on the administrative record (ECF 54) is granted.  A separate order reflecting this memorandum opinion will be entered directing the entry of judgment.

s/ Richard A.  Hertling
**Richard A.  Hertling**
**Judge**

26